# CV 13-4920

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

ORIGINAL

COGAN, J.



RECEIVED
SEP - 3 2013
PRO SE OFFICE

------------------------------------------------------ X

SIKHS FOR JUSTICE INC (SFJ) on behalf
of deceased  and injured members of the
Sikh community,

JASBIR SINGH,
Individually and on behalf of deceased family
Members

MOHENDER SINGH,
Individually and on behalf of his deceased father     :     CIVIL ACTION NO.
SARDAR DARSHAN SINGH,

                    **Plaintiffs,**

    - against -

Ms. Sonia Gandhi,     :     CLASS ACTION
a national and citizen of India,   President
Indian National Congress,
a/k/a, "CONGRESS (I)"

                    **Defendant**     :     PLAINTIFFS DEMAND
                                          A TRIAL BY JURY

------------------------------------------------------ X

    Plaintiffs, on behalf of themselves, their deceased family members and all others similarly situated who were victims of or related to the victims of "The Sikh Genocide of 1984"  (collectively "Plaintiffs"), as and for their complaint in this action respectfully allege as follows:

1

## PRELIMINARY STATEMENT

1. On or about August 15, 2013, a group of Congress (I) workers, the party headed and controlled by the Defendant, attacked Tilak Vihar, New Delhi, a colony inhabited by the survivors, mostly widows of November 1984 Sikh Genocide with the intention to harm the witnesses and plaintiffs in order to protect and shield the members, office bearers, leaders and supporters of her party that have played an active role in November 1984 Sikh Genocide. Congress party workers were actively supported by police and many Sikhs sustained injuries in the attack. This recent attack is in continuation of the Genocidal attacks on the Sikh population of India starting from November 1984.

On or about February 15, 2011, a mass grave was discovered in the Village of Hondh-Chillar, Haryana, India, that contained the remains of men, women and children who had been tortured and murdered in what has become known as " The Sikh Genocide of 1984." This discovery coming twenty-six years after the fact is evidence not only of the genocide that took place throughout India then but also of the cover up that began all those years before which continues to this day.

2. From November 1 through November 4, 1984 approximately 30,000 members of a minority religious group known as the "Sikhs" were intentionally tortured, raped and murdered by groups that were incited, organized, controlled and armed by the ruling political party known as India National Congress Party a/k/a, "Congress (I)" (hereinafter "Congress (I)").

3. Sonia Gandhi, President of Indian National Congress, a political party which is currently ruling India and was also ruling the country during November

2

1984, has been playing a leading role in shielding the members, office bearers, leaders and supporters of her party that played an active role in the Genocide; exercised command responsibility over it, conspired with and aided and abetted others including local police officers, fellow Congress (I) officials, para-military groups and persons or groups acting in coordination with the them or under their control, in carrying out the genocide, crimes against humanity and attempted extermination of the entire Sikh community in India (hereinafter "Defendant Gandhi").

4. This is an action for compensatory and punitive damages for torts committed by Congress (I) and Gandhi (hereinafter "Defendants") in violation of the laws of nations, customary international law, treaties of the United States including the Convention on the Prevention and Punishment of the Crime of Genocide of 1948, the Torture Victim Protection Act and federal common law who, at all relevant times, were acting under color of state law of the state of India and with the actual or apparent authority of the Government of India.

## JURISDICTION AND VENUE

5. Plaintiffs allege that Defendant Gandhi is liable, for protecting and shielding those who committed genocide, extrajudicial killings, torture, crimes against humanity, forced exile, attempted extrajudicial killings, torture and genocide and for conspiring with and aiding and abetting others in the aforementioned conduct. Therefore, this Court has jurisdiction over this action based on the Alien Tort Statute, 28 U.S.C. 1350, the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. 1350 (note)) ("TVPA"), federal common law and 28 USC 1331.

6. Venue, upon information and belief, is proper in the Eastern District of

New York pursuant of 28 USC § 1391 (b), (c) and (d).

7. This Court has personal jurisdiction of the Defendants pursuant to Rule 4, Fed. R. Civ. P. and N.Y.C.P.L.R. 301 (McKinney 2010).

## THE PARTIES

8. Plaintiff "Sikhs for Justice" is a domestic not-for-profit corporation organized and existing pursuant to the laws of the State of New York with its principal place of business located at New York, New York and was formed to seek justice and compensation for those Sikhs who were injured or whose family members were killed and whose property was destroyed during the Sikh Genocide of November 1984.

9. Plaintiff Jasbir Singh is a citizen of India, a resident alien of the United States currently residing in the State of California and, at all relevant times, was and is a member of the Sikh religious community. Plaintiff Jasbir Singh sues on behalf of himself for the severe physical injuries and severe mental and emotional pain and suffering sustained by him during The Sikh Genocide of 1984.

10. Plaintiff Mohender Singh is a citizen of India, a resident alien of the United States currently residing in the State of California and, at all relevant times, was and is a member of the Sikh religious community. Plaintiff Mohender Singh sues on behalf of himself and his deceased father Sardar Darshan Singh. Plaintiff Mohender Singh is the lawful heir and next of kin of his late father and a proper claimant under foreign and domestic law to assert claims on his behalf. To the extent there are individuals with priority or equal right to assert these claims they have renounced or otherwise waived their right to do so and have assigned those rights to Plaintiff Mohender Singh.

4

11.  Congress (I) is and was at all relevant times a private political party organization created pursuant to the laws of India. Congress(I) conducts ongoing and significant business in the United States particularly in the State and City of New York both directly and through its wholly owned subsidiary "Indian National Overseas Congress" (hereinafter "INOC") which is a corporation organized and existing pursuant to the laws of the State of New York with its principal place of business located at Queen County, State of New York.  Upon information and belief, Congress (I) operates INOC as a department or agent and controls its activities.

12.  Defendant Ms. Gandhi is and was at all relevant times a citizen of India and a leader of Congress (I).  Gandhi has been President of Congress (I) and has been in control of the party ever since. As set forth in more details below, Gandhi played an active role in shielding and protecting the members, office bearers, Parliamentarians and supporters of her party who incited, organized and controlled groups of people that attacked and killed innocent Sikhs in the India during November 1984. Gandhi also purposefully shielded members of police, administration and other government functionaries who aided and abetted the actions of others and refused to come to the aid of  Sikhs who were being tortured, raped and killed and whose property was being destroyed during the campaign of terror.

## THE CLASS ALLEGATIONS

13.  The class consists of all Sikh men, women and children who survived the unlawful attacks on them in India in November 1984 and the lawful heirs and

claimants of those men, women and children that did not survive. The class also consists of Sikhs whose homes, businesses and temples were damaged or destroyed and whose personal property was damaged or stolen. The class period is from November 1 to November 4, 1984 and includes resident and non-resident alien Sikhs and Sikhs currently residing in India. The class also may properly be certified as sub-classes as follows:

(a) <u>Surviving Parents' Class</u> - all persons who are the surviving parents of persons who were executed, murdered and/or killed in India between November 1 and 4, 1984 in connection with "The Sikh Genocide of 1984."

(b) <u>Surviving Children's or Dependent's Class</u> - all persons who are the surviving children or dependents of persons who were executed, murdered and/or killed in India between November 1 and 4, 1984 in connection with "The Sikh Genocide of 1984."

( c ) <u>Surviving Spouse Class</u> - all persons who are the surviving spouses of persons who were executed, murdered and/or killed in India between November 1 and 4, 1984 in connection with "The Sikh Genocide of 1984."

(d) <u>Torture Victim's Class</u> - all persons who were themselves tortured and/or subjected to crimes against humanity in India between November 1 and 4, 1984 in connection with "The Sikh Genocide of 1984."

(e) <u>Property Damage Class</u> - all persons whose homes, businesses, temples, religious shrines and personal property were damaged, destroyed, stolen and/or confiscated in India between November 1 and

4, 1984 in connection with "The Sikh Genocide of 1984."

14. The exact number of class members is not known, however, the official figures of the Indian Government put the number of Sikhs that were killed by the violence orchestrated by defendants in November 1984 in New Delhi alone at approximately 3,000.

15. The claims of the named plaintiffs, the class representatives, are typical of the claims of the class. The named plaintiffs are able to and will fairly and adequately protect the interests of the class.

16. There are common questions of law and fact in this action that affect and relate to each member of the class including:

    a.    Whether the defendant shielded and protected who committed and/or ordered the killing, assault and torture of Sikhs and the looting and destruction of their homes, businesses and temples between November 1 and 4, 1984 in India.

    b.    Whether the conduct of the defendant of shielding and protecting the perpetrators of November  1984 Sikh Genocide which was organized, planned, aided, abetted and carried out by the members, officials, workers and supporters of her party - Congress(I), gives rise to liability under applicable international and domestic laws, international treaties and federal common law.

    d.    Whether the acts and omissions of the defendant with regard to November 1984 Sikh Genocide were committed as part systematic policy of the party that she control.

17. This action is properly maintained as a class action because: a)

defendants acted and failed to act in a way generally applicable to the class, making any declaratory relief awarded appropriate to the class as a whole; and b) questions of law and fact common to the class predominate over questions affecting individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## STATEMENT OF FACTS

### A. The Background

18. The Nation of India is a Federal Parliamentary Republic that is headed by a Prime Minister who is an elected representative of the people.

19. India is governed by the "Central" or "Union" Government (hereinafter "Central Government") which is comprised of numerous departments, agencies and ministries.

20. There are twenty-eight1 states or provinces in India that are governed by elected officials called Chief Ministers who in turn appoint officials to run the local agencies, departments and instrumentalities of the state.

21. The Central Government and the states are administered, controlled and otherwise run by the political party that holds the majority of seats in the Parliament and State Assemblies, respectively.

22. The seat of the Central Government is located in the capital city of New Delhi.

23. New Delhi's municipal government is traditionally administered and controlled by the political party in power in the Central Government.

24. In October and November of 1984, Defendant Congress (I) was the

---

[1] In October-November 1984, India consisted of only twenty-five (25) states. Three additional states were carved out

8

ruling political party of the Central Government of India with a majority in the Indian Parliament and, thus, was also in control of the local government of New Delhi.

25.  Moreover, in October and November 1984 Congress (I) also held majorities in eighteen of the twenty-two Indian States.

26.  In other words, Congress (I) virtually had complete control over the governance of India in October and November 1984.

27.  The Prime Minister of India in 1984 was Indira Gandhi, the daughter of Jawaharlal Nehru, the first Prime Minister of India post- Independence and protégée of Mahatma Gandhi.

28.  Both Gandhi and Nehru were leaders of Congress (I) following independence in 1947 and Indira Gandhi was the leader of Congress (I) at the time she served as Prime Minister.

29.  On October 31, 1984, Prime Minister Gandhi was shot by two of her body guards who happened to be Sikhs.

30.  In less than twenty-four hours, an organized targeting of Sikhs throughout India began particularly in the capital of New Delhi that continued unabated until November 4, 1984.

31.  During the four day rampage, more than 3,000 Sikhs were killed in New Delhi alone, hundreds of women were gang raped, children were brutally tortured, hundreds of houses and properties were looted and destroyed and scores of Sikh temples were ransacked and burned to the ground.

32.  As a result, more than 300,000 Sikhs across India were displaced.

33.  The Sikh Genocide was planned at a meeting held at Congress (I)

in later years.

headquarters located at 24 Akbar Road, New Delhi on October 31, 1984, the night Indira Ghandi was killed.

34.   According to eyewitnesses, the meeting was attended by Congress (I) members of parliament and senior officers of Congress (I) including Jagdish Tytler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das and Defendant Gandhi.

35.   Leaders and officials of Congress (I) delivered inflammatory speeches and created slogans like "Khoon ka badla khoon" (blood for blood) and "khoon ki chintey sikhon ke ghar tak pahunchni chahiye" (splashes of blood should reach the doorsteps of Sikhs) in order to incite a genocidal riot directed at the Sikhs ostensibly to avenge the death of Indira Ghandi.

36.   While the news of the attack on the Prime Minister did not bring any immediate peril to the Sikhs, after the Congress (I) meeting on October 31 a widespread, systematic and organized effort was underway the next day lead by Congress (I) officials acting under the authority of Congress (I) to incite, organize and weaponize  groups of people to kill Sikhs initially in New Delhi and then throughout India.

37.   Prisoners, criminals and professional thugs were hired by Congress (I) leaders, coupled with Congress (I) workers and supplied with flammable substances including kerosene oil, to burn Sikhs as well as their houses, businesses and temples.

38.   Indeed, police officers even supplied diesel from police jeeps to these groups to help carry out the carnage.

39.   In addition, Indian police either actively participated in murdering Sikhs or stood by as silent spectators while Sikhs were being killed and, in some

instances, burned alive.

40. Between November 1 and 4, 1984, Congress (I) ruled and controlled  18 states where it organized, directed, controlled and/or purposefully aided and abetted "The Sikh Genocide."

41. In the State of Madhya Pradesh2 the Chief Minister was Arjun Singh of Congress (I). Between November 1 and 4, 1984 throughout the state of Madhya Pradesh, Sikhs were attacked, killed, tortured and  raped, their properties looted and their temples burned.  According to news reports and government figures, in 43 of the state's 45 districts Sikh communities were attacked and destroyed. One of the  *modus operandi* of the attacks on the Sikhs who were travelling on trains at that time took place in the City of Morena. A crowd of 1,000 people comprised mostly of Congress (I) workers and sympathizers and led by Congress (I) leaders gathered at the railway station. They first stopped the Utkal Express Train going to New Delhi, but found no Sikh passengers on it. Almost immediately the Chahtisgarh Express Train from New Delhi pulled in to the station and was brought to a halt by the crowd which then proceeded to drag out two dozen Sikh men, women and children from the train and slaughtered twelve including a ticket taker.

42. In October-November 1984, the present State of Chhattisgarh was a region located within the State of Madhya Pradesh where Congress(I) officials, members and workers directed and took part in attacks on Sikh people, properties and temples which resulted in at least thirteen deaths.

43. In the State of Utter Pradesh ("UP") the Chief Minister was Narayan

---

[2] Madhya Pradesh is the home state of defendant Gandhi who has continuously been winning the election as Member of Parliament (MP) from the state since 1984. MPs exert and enjoy a great deal of control and influence over the party workers and cadres in their home states.

Dutt (ND) Tiwari of Congress (I). According to the Central Government's official records, 260 Sikhs were killed across the state between November 1 and 4, 1984. These numbers are believed to be grossly understated. For example, in the City of Kanpur alone, approximately 3,000 FIRs ("First Information Reports" of crime filed with the police under the Indian Criminal Law Procedure), were lodged with the police. Approximately 4,200 houses, shops, godowns and factories were destroyed in the violence that went on for 36 hours starting on November 1, 1984.

44. The details of the attack on Plaintiffs Davinder Pal and Iqbal Bhatia serve as another example of the *modus operandi* of the attacks on Sikhs throughout the states in that the attackers were led by Congress (I) leaders, officials and workers and the police and local administrators either purposefully assisted the attackers and/or planned the attacks.

45. In October-November 1984 the present State of Uttarkhand was a region located in the State of Uttar Pradesh ("UP") and was controlled and governed by the State of Madhya Pradesh under Congress (I) Chief Minister Arjun Singh.

46. In the areas comprising today's state of Uttarkhand at least 201 attacks were directed and/or carried out against the Sikhs, their properties and temples by Congress (I) leaders, workers and sympathizers with the purposeful and substantial assistance of the local police and administrators.

47. In the State of Bihar the Chief Minister was Chandrashekhar Singh of Congress (I). Throughout the State of Bihar 160 attacks on Sikh lives and properties took place between November 1 and 4, 1984 led by Congress (I) officials, leaders and workers where Sikhs were murdered and many others tortured and where Sikh properties were looted and destroyed.

48. In October-November 1984, the present State of Jharkhand was part of

the State of Bihar which was governed and controlled by Congress (I) and Chief Minister Chandrashekhar Singh.

49.    In the areas comprising today's state of Jharkhand at least 460 attacks were directed at the Sikhs, their properties and temples by Congress (I) officials, leaders and workers and the police and local administrators either purposefully assisted the attackers and/or planned the attacks.  At least 84 Sikhs lost their lives in those attacks and several hundred were seriously injured.

50.    In the State of Gujarat the Chief Minister was Madhav Singh Solanki of Congress (I).  Many attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the State of Gujarat, however, no accurate account of the casualties has ever been released by the government.

51.    In the State of Haryana[3] the Chief Minister was Bhajan Lal of Congress (I). Throughout the State of Bihar 65 attacks on Sikh lives and properties took place between November 1 and 4, 1984 led and/or directed by Congress (I) officials, leaders and workers and the police and local administrators either purposefully assisted the attackers and/or planned the attacks.  The attacks resulted in numerous deaths, serious injuries by torture and damage to real and personal property.

52.    In the State of Himachal Pradesh the Chief Minister was Virbhadra Singh of Congress (I).  Throughout the State of Himachal Pradesh 78 attacks on Sikh lives and properties took place between November 1 and 4, 1984 which were led and/or directed by Congress (I) officials, leaders and workers and the police

---

[3] Haryana is the state where on February 15, 2011, a "Mass Grave" of Sikhs killed on November 02, 1984 was discovered in village Hondh-Chillar in District Rewari. The residents of the village were killed, women raped, Sikh Temple burnt and desecrated by attackers, who according to eyewitnesses came in buses owned and operated by the Government of Haryana. The attackers were led by Congress leaders and they exclusively targeted Sikh population of the village

and local administrators purposefully assisted the attackers and/or planned the attacks. The attacks resulted in numerous deaths, serious injuries by torture and damage to real and personal property.

53. In the State of Maharashtra the Chief Minister was Vasantdada Patil of Congress (I). Numerous attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the state of Maharashtra, however, no accurate account of the deaths and injuries suffered by Sikhs has ever been released.

54. In the State of Manipur the Chief Minister was Rishang Keishing of Congress (I). Numerous attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the state of Manipur, however, no accurate account of the deaths and injuries suffered by Sikhs has ever been released.

55. In the State of Kerala the Chief Minister was K. Karunakaran of Congress (I). Numerous attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the state of Kerela, however, no accurate account of the deaths and injuries suffered by Sikhs has ever been released.

56. In the State of Meghalaya the Chief Minister was W.A. Sangma of Congress (I). Numerous attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the state of Meghalaya, however, no accurate account of the deaths and injuries suffered by Sikhs has ever been released.

57. In the State of Mizoram the Chief Minister was Pu Lalthanhawla of Congress (I). Numerous attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the state of Mizoram, however, no accurate account of the deaths, injuries and losses suffered by the Sikhs has ever been released.

58. In the State of Orissa the Chief Minister was Janaki Ballabh Pattanaik of

14

Congress (I).  Throughout the State of Orissa 143 attacks on Sikh lives and properties took place between November 1 and 4, 1984 which were led and/or directed by Congress (I) officials, leaders and workers and the police and local administrators  purposefully and substantially assisted the attackers and/or planned the attacks.  The attacks resulted in numerous deaths, serious injuries by torture and damage to real and personal property.

59.  In the State of Rajasthan the Chief Minister was Shiv Charan Mathur of Congress (I).  Numerous attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the state of Kerela, however, no accurate account of the deaths and injuries suffered by Sikhs has ever been released.

60.  The Chief Ministers were the heads of state at the local level and exercised complete control over the state machinery and the local Congress (I) party machine and acted under the authority of Congress (I).

61.  Despite the widespread killings and lawlessness, martial law was never imposed and the Indian Army was not called in until after November 4, 1984.

**B.  The Victims**

Plaintiff Jasbir Singh

62.  In November 1984 Plaintiff Jasbir Singh was living with his family in New Delhi, India.  On or about November 1, 1984, their home was attacked by a group led by Congress (I) leader Bhola Ram.  Plaintiff Jasbir Singh's uncle was murdered and he escaped an attempt on his life by running, hiding and cutting his hair to remove any evidence of his Sikh identity.  While he was hiding, Plaintiff Jasbir Singh over heard Congress (I) official Jagdish Tytler address a group of Congress (I) workers and complain that they were " not killing enough Sikhs." From that point on Plaintiff Jasbir Singh was very active in the justice campaign

15

for the Sikh victims of 1984. Because of his activities he was constantly threatened by Congress (I) party leaders and workers and was detained and tortured by local police on several occasions at the request of Congress (I) leaders. In fact, Congress (I) leader Jagdish Tytler had him kidnaped and tortured for submitting an affidavit to authorities regarding the former's actions on November 1, 1984. Due to the above activities, Plaintiff Jasbir Singh was forced to flee India in 2002 and was granted political asylum by the United States in 2007 based on the above. Thus, Plaintiff Jasbir Singh sues on behalf of himself for the severe physical injuries and severe mental and emotional pain and suffering sustained by him as a result of the assault, attempted extrajudicial killing and torture at the hands of the defendants during and after The Sikh Genocide of 1984.

<u>Plaintiff Mohender Singh</u>

63. Plaintiff Mohender Singh sues on behalf of himself and his deceased father Sardar Darshan Singh for the severe physical injuries and severe mental and emotional pain and suffering sustained by them during The Sikh Genocide of 1984.

64. At all relevant times Plaintiff Mohender Singh and his family lived together as residents of the City of New Delhi, India.

65. On November 1, 1984, Congress (I) leader and Member of Parliament HKL Bhagat organized, armed and led an attack on the Mohender home by a group of Congress (I) workers including, but not limited to, Kishori, Mohammad Abbas, Dr. Zulfqar Kashaf (a/k/a "Lamboo") and Rampal Saroj.

66. The group broke down the front door of the home and dragged Mohender Singh's father, Sardar Darshan Singh, and his two uncles from the house and beat them with wood and iron clubs in the street. They searched for Mohender Singh attempting to kill him and any other children they found.

67. On the command of HKL Bhagat and other Congress (I) leaders present, the Congress (I) workers pulled out knives and hatchets and proceeded to cut Mohender Singh's father and two uncles to pieces. They died on the street in front of their home and family including Plaintiff Mohender Singh.

68. Plaintiff Mohender Singh was living under death threats in India ever since the events of November 1984 and was forced to leave his country for the United States in 2008. He is now seeking political asylum based on the real and present danger he faces in India due to the aforementioned conduct. Plaintiff Mohender Singh is bringing this action on behalf of himself and his late father for the severe physical injuries and severe mental and emotional pain and suffering they sustained during The Sikh Genocide of 1984 and the economic damages he sustained as a result of the loss of his father.

### C. **The Final Solution**

69. As the oldest and most established private political party organization in India, or organization overall, Congress (I) relied on and utilized the facilities, resources and machinery it already had in place to carry out the systematic and widespread campaign of terror against the Sikhs in November 1984.

70. As the ruling political party of India nationally and locally, Congress (I) was able to pursue a policy of genocide against the Sikhs under color of state law and with the apparent or actual authority of the Government of India.

71. As noted above, Prime Minister Indira Gandhi was shot at her residence, No. 1 Safdarjung Road, New Delhi, at 9:15 AM on October 31, 1984. The news was immediately broadcast throughout India by All India Radio and Doorshan (state owned TV Channel and Radio). Hearing the news Congress (I) leaders,

workers and sympathizers from all over India began to gather in New Delhi.

72. The death of Indira Gandhi did not pose an immediate threat to the Sikhs; instead it was almost 24 hours later that on November 1, 1984 systematic attacks on Sikhs began all across India. Congress (I), the political party in power in Center and in the majority of the Indian States planned, orchestrated and carried out the attacks on Sikhs starting from November 1, 1984 till at least November 4, 1984.

73. Indira Gandhi's death was officially announced in the afternoon of October 31, 1984.

74. A few hours after the announcement of death a meeting of Congress (I) leaders and workers who had gathered from across the country took place at Congress (I) headquarters located at 24 Akbar Road, New Delhi. The conspiracy to attack, kill and destroy Sikhs throughout India was hatched in this meeting. Among many other leaders, those present at the meeting included HKL Bhagat, Dharamdas Shastri, Lalit Maken, Sajjan Kumar, Jagdish Tytler and Kamal Nath. Congress leaders announced in this meeting that Congress (I) will avenge the death of Indira Gandhi by killing Sikh people and destroying their properties.

75. Different leaders of Congress (I) took responsibility to carry out and make possible the attacks on Sikhs in their respective areas of influence. The control of national electronic media (All India Radio and Doordarshan) was taken over by the Congress (I) leaders who then used the media to deliver hate speeches against Sikhs to instigate, provoke and activate Congress workers and sympathisers all over India to attack Sikhs. Messages such as *"Khun ka badla khun se lenge"* (Blood for Blood) or *"Sardar Qaum Ke Ghaddar"* (Sardars' (another name for Sikh men) are the nation's traitors) were broadcast through the state-

18

owned TV channel Doordarshan.

76. Rumours were spread that Sikhs have distributed sweets and have danced on the death of Indira Gandhi to justify the killing of Sikhs and quell any possible resistance from the general public.

77. During the night of October 31 and early morning of November 1, Congress (I) party leaders met with their local supporters to implement their plan to Genocide Sikhs and distribute weapons and money.

78. Through the Home Ministry of India (under whose control the police and district administrations fall) which was then headed by Congress leader P.V. Narsimha Rao, police and district administrators of Delhi and other cities were either paralyzed or were used to attack the Sikhs.

79. Sikhs in police, army and paramilitary forces were disarmed.

80. Government issued voter lists and ration card lists were obtained and distributed to identify and locate Sikh populations.

81. Congress (I) workers, supporters and others were contacted and recruited to attack the Sikhs.

82. In northern parts of India, under-training recruits from "police training centers" were also brought in to attack Sikhs.

83. Attackers were armed with wooden sticks, iron rods, tires for neck lacing, (the practice of putting a car tire around a victim's neck and setting it on fire), kerosene oil, Liquid Petroleum Gas (LPG) cylinders and other flammable material and weaponry.

84. Trains, buses and other vehicles of the Indian Transport Authorities were commandeered to transport attackers to where Sikhs lived.

85. Trains run by Indian Railways were directed by Congress (I) officials to

make non-scheduled stops at designated locations where attackers were waiting to pull the Sikhs out of the trains to torture and kill them.

86. The Railway Protection Forces shot and killed Sikh passengers on many trains.

87. Thousands of Sikh women were gang raped.

88. Sikhs injured in attacks were refused medical treatment at the hospitals.

89. Media outlets and reporters who tried to capture and report the incidents of violence were attacked by Congress (I) party workers. According to Mark Litke, a group of Congress (I) workers attacked an ABC-TV news crew filming the streets where Sikhs were subject to Genocide.

90. Sikh temples were attacked in order to destroy, harm and injure the Sikh identity and dignity. In Delhi alone, 370 Sikh temples were attacked and desecrated. The number of temples attacked in other parts of India runs into the hundreds.

91. Police, Railway Protection Forces and other para-military forces were commanded to participate in killing the Sikhs or ordered to stand down and watch as the Sikhs were being killed.

92. The Indian Military was not allowed to defend and save Sikhs in the cities by civil administrators or mayors who were obligated under Indian civil law to call on the army under these circumstances but refused.

93. For example, in the City of Kanpur (UP) city administrator Brijindra Yadav refused for three days to hand over the city to the Army and during that time thousands of Sikhs were killed.

94. The foregoing is based primarily on affidavits, interrogatories, depositions, first information reports and other evidence accumulated over twenty-

six years most of which has been compiled by a variety of human rights organizations and catalogued in the United States Library of Congress.

95. The above scenario however provides only a snapshot of the crimes against humanity that took place in India against a distinct minority religious group known as "Sikhs" between November 1 and 4, 1984 which, as of today, has seen no Congress (I) official or worker prosecuted or Sikh victim fairly and adequately compensated.

## EXHAUSTION OF REMEDIES AND EQUITABLE TOLLING

96. The attitude at every level of the Indian government for twenty-six years can be best summed up by the comment made by Rajiv Gandhi the son of Indira Gandhi and husband of the Defendant, who assumed the position of Prime Minister immediately upon her death. Several weeks later in the aftermath of the obvious slaughter of Sikhs in November 1984, Rajiv Gandhi was asked how such a thing could happen and stated: "When a big tree falls, the earth around it shakes."

97. Plaintiffs would be in grave danger if they had to return to India to file a civil action or participate in any proceedings or litigation. Most of the named plaintiffs either have been granted political asylum or are seeking it based on the death threats they have been consistently receiving for demanding that those responsible for The Sikh Genocide of 1984 be brought to justice and that they along with other victims be allowed to file civil actions in order to be properly compensated for their suffering and losses.

98. For more than twenty-six years the Indian government has failed, neglected and refused to properly investigate the incident.

99. All efforts by or on behalf of the plaintiffs to seek justice and pursue an adequate civil remedy have been undermined by the defendants through their

influence and position.

100. For example, an eyewitness to the atrocities in New Delhi, Surinder Singh, provided a sworn statement to the authorities in 2008 detailing the horrific events of November 1, 1984. He provided the statement while he was living in exile in the United States where he had fled to several months before following numerous death threats.

101. Shortly after he gave his statement, he was contacted by Indian officials and advised that unless he returned to India immediately, his wife and children would be tortured and executed.

102. Upon his arrival at New Delhi Airport in February 2009, Surinder Singh was detained by Indian officials and mercilessly tortured. Two weeks after he was freed, he died in the hospital from the injuries he received while a guest of the Indian government.

103. In short, Plaintiffs and those they represent have no adequate or available remedies in India.

104. Moreover, India's twenty-six year quest for "domestic and international legitimacy and power" provided it with the incentive to intimidate witnesses, to suppress and destroy evidence, and to commit additional human rights abuses against those who spoke out including plaintiffs - an incentive Congress (I) has acted on since 1984 in an effort to protect their former and, in some cases, current leaders against charges of human rights abuses.

105. Congress (I) has been effectively in control in India since at least 1984. Thus, the extraordinary circumstances that confronted and continue to confront plaintiffs were and are beyond their control and unavoidable even with diligence.

106. Indeed, on February 21, 2011, after the discovery of the mass grave of

22

Sikhs at Hond-Chhilar, Haryana, former Union Home Minister and Congress (I) official, Buta Singh, publically confessed that the then Chief Minister of Haryana Congress (I)'s Bhajan Lal was responsible not only for the Genocide but also for the cover up.

107.  The only chance for plaintiffs and those they seek to represent to obtain a fair administration of justice is here and now.

### FIRST CLAIM FOR RELIEF

108.  Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 107 of the complaint as if fully set forth herein at length.

109.  The abuses committed against Plaintiffs, the family members they represent and the class they seek to represent constitute crimes against humanity and were committed by directly, intentionally and deliberately in pursuit of, inter alia, genocide by Congress (I) of whose defendant is the President.

110.  Members and officers of Defendant's party committed acts of genocide, gang rape, torture, summary executions, extra-judicial killings and wholesale property destruction against Plaintiffs which were not authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people.

111.  Acts and omissions of members and officers of Defendant's party, the Congress (I) constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" as contemplated in the Alien Tort Statute, 28 U.S.C. 1350, in that the acts and omissions violated customary international law prohibiting genocide, torture, crimes against humanity, extrajudicial killings, mass rapes and summary executions as reflected, expressed and defined in multilateral

treaties including, but not limited to, the Convention on the Prevention and Punishment of the Crime of Genocide, art. III(e), Dec. 9, 1948, 78 U.N.T.S. 277, 280, as well as other international and domestic instruments, resolutions, judicial decisions and other authorities.

112.  Defendant is liable for sheilding and protecting the members and officers of her party, the Congress (I) who committed the torts against plaintiffs as described herein.

113.  Congress (I) also exercised command responsibility over its officials, leaders and workers and/or subordinates or persons or groups acting in coordination with it and/or them or under their control, in committing the acts of genocide, gang rape, torture, summary executions, extra-judicial killings, attempted extrajudicial killings and wholesale property destruction against Plaintiffs.  Defendant Congress (I) knew or should have known that those crimes were being committed by its officials, leaders and workers and/or subordinates or persons or groups acting in coordination with it and/or them and/or under their control, and it failed to prevent the crimes or to punish those responsible.

114.  Conduct of the Defendant's party, the Congress (I), caused the crimes against Plaintiffs and those they represent and caused them to sustain severe pain and suffering and/or serious bodily injury or death as well as the loss of real and personal property in amounts to be determined at trial.

115.  Defendant's acts and her party's actions and omissions were deliberate, willful, intentional, wanton and malicious and should be punished by an award of punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

116. Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 115 of the complaint as if fully set forth herein at length.

117. Defendant Gandhi furthered the violations of customary international norms, the laws of nations, treaties of the United States and the TVPA by purposefully, knowingly and substantially shielding and protecting the members, leaders, officers, workers and supporters of her party, the Congress (I) including, but not limited to, Kamal Nath, Jagdish Tytler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das, who had killed, tortured and raped, Sikh men, women and children and the wholesale destruction of their property throughout India between November 1 and 4, 1984.

118. Defendant Gandhi furthered the violations of customary international norms, the laws of nations, treaties of the United States and the TVPA by purposefully, knowingly and substantially shielding and protecting the members, leaders, officers, workers and supporters of her party, the Congress (I) including, but not limited to Kamal Nath, Jagdish Tytler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das, and others who had killed, tortured and raped, Sikh men, women and children and the wholesale destruction of their property throughout India between November 1 and 4, 1984 while knowing or should have known that the perpetrators had violated clearly established customary international law norms.

119. Defendant Gandhi's conduct of shielding and protecting the perpetrators of November 1984 Sikh Genocide caused the Plaintiffs and those they represent to sustain great pain and suffering and/or serious bodily injury or death as well as the loss of real and personal property in amounts to be determined at trial.

120. Defendant Gandhi's acts and omissions were deliberate, willful,

intentional, wanton and malicious and should be punished by an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs on behalf of themselves and those they represent pray for judgment against the Defendants, jointly and severally, as follows:

a) For compensatory damages in an amount to be proven at trial;

b) For punitive and exemplary damages in an amount to be proven at trial;

c) For reasonable attorney's fees, costs and interest;

d) For a declaratory judgment holding that Defendants' conduct was in violation of the laws of nations, customary international law and domestic laws;

e) For an Order certifying the plaintiffs' class as alleged herein; and

e) For such other and further relief as the Court may deem just and proper.

A jury trial is demanded on all issues.

Dated: September 03, 2013

*Avtar Singh*

**"Sikhs for Justice"**
through its Coordinator
Avtar Singh
**Plaintiff**
Empire State Building
350 Fifth Ave, 59th Floor,
New York, NY 10118
T: 212.301.2707 &  F: 212.601.2610

**Jasbir Singh**
**Plaintiff**
350 Fifth Ave, 59th Floor,
New York, NY 10118
T: 212.301.2707 &  F: 212.601.2610

**Mohinder Singh**
**Plaintiff**
350 Fifth Ave, 59th Floor,
New York, NY 10118
T: 212.301.2707 &  F: 212.601.2610